Okay, the next case before the court is case number 182361, Persian Pharmaceuticals v. Alvogen Malta Operations Ltd. It is an appeal from the District of Delaware. Yes, Your Honor, and I've reserved three minutes for rebuttal. Okay. This court should reverse because undisputed facts show that the District Court's conclusions that the claims were obvious and lacked written description were legally wrong. As to the obviousness, the District Court... Those cover all the claims, right? Yes, Your Honor. So you have to win on both points. Yes, Your Honor. Okay. The District Court made a factual finding that there was no guidance in the ART on the proper dose for hepatically impaired patients, and second, the District Court made a finding that the ART was unpredictable, which is the touchstone of non-obviousness. Those findings alone should have resulted in a conclusion that the claims were not obvious, and as to written description, there's no dispute that the inventors possessed the claimed invention. Example 8 in the patent is the claimed invention. Well, I mean, couldn't we conceivably conclude that one of the findings in the alternative holding was just wrong, and that, therefore, the finding as it relates to obviousness was correct, or vice versa? Well, here's the problem, Your Honor. It's a question of perspective. So the 103 analysis is done without having any knowledge of the patent. The 102 analysis is done knowing the patent. The District Court said that the prior ART was unpredictable. He didn't make any carve-out for any prior ART that made it predictable. He said all the prior ART was unpredictable in the 112 analysis. And in fact, based on those undisputed findings, this Court should reverse the obviousness, and with regard to written description, not only was there an example in the patent that shows that the inventors possessed it, but there was other information that will allow formulators to make other examples, and what happened here, contrary to Alcon v. Barr, the District Court added additional requirements that are legally irrelevant. Before I go into the substance, I just want to make sure we're all clear as to what the Here, they address the appropriate dose for an opioid, hydrocodone, to give to patients who have hepatic impairment. And the danger with diminishing these types of drugs to hepatically impaired patients is that if they're given too much drug, and that could happen because their livers don't metabolize all the drug, they could get either respiratory side effect or overdosing and potentially even die from the drug. And prior to the invention, every commercial extended release opioid product that had been tested in patients with hepatic impairment or moderate hepatic impairment had a dose reduction in it. So at the time of the filing, the state of the art was that you reduce the dose for extended release products for hepatically impaired patients. And to the surprise of the inventors, their invention did not require that dose adjustment for hepatic impairments, which is important because it allowed the doctors to give the proper dose to alleviate the pain and not have to worry about potential overdose. Here the district court's conclusions as to obvious cannot be reconciled with his findings or other admissions by Alvagen's expert. So for example, on motivation, the court merely said a POSA would have been motivate to look to Jane and the Vicodin-slash-Lortab labels for guidance as to the proper dose of the Devane formulation in hepatic impairment patients. However, in another section of the decision, the district court directly contradicted that. He said that nothing in the art provided guidance as to which ER formulations could be administered to hepatically impaired patients. But is it your point that the district court should have ignored the teachings in Jane? I don't believe he ignored the teachings in Jane, but I'm saying... But I'm saying, are you saying he should have? Well, I'm not saying that he should have ignored the teachings in Jane. What I'm saying is that he said specifically that Jane provided no guidance as to what the proper dose would have been. And in fact, on that point, he also, if you look at the motivation finding, the ultimate finding, it only says that the art would have, quote, provided guidance. He doesn't say what guidance. And if you look at other parts of the decision, the district court says... Well, he walks through it, right? He says Devane discloses a formulation that's identical to the one described in the patents, right? That's right. But at the time of the filing, no one knew what the proper dose of that formulation would have been for hepatically impaired patients. There was nothing in the art that pointed to that. That's where Jane steps in, where he finds that Jane reports out that there's similar results for people who are hepatically impaired and normal subjects. And I realize that's a hydrocodone plus acetaminophen combination, but then there's another finding that the court below makes, which is that acetaminophen and hydrocodone metabolize differently and don't really impact each other's AUC or PK properties. That particular data is irrelevant, because it wasn't in hepatically impaired patients. That's a line of theme throughout the decision. But doesn't Jane say that there's no dose adjustment that's necessary for... No, Jane, it doesn't actually say that. Well, the district court made a finding, in fact, that it did. Well, what the court said is that he presumed, he only presumed that the levels, because what Jane does is gives information about the acetaminophen. It said it was between, I think, 35 to 40 or so above what would be expected. And the court said, presumably, that that would be the same for hydrocodone without having any data whatsoever. And a presumption is not clear and convincing evidence. In addition, to go back to your point, Judge Chen, the data you were referring to was in Devane, and Devane has no information on how you would use any of those formulations for hepatically impaired patients. And there's no information... No, the hepatic impairments study is in Jane, right? Yes. There is a reference to one. In Jane, it reports out that the outcomes are similar between hepatically impaired and normal subjects, right? It does report that out. What that means is... And then the court below relied on that to conclude that, therefore, if you had a hydrocodone only administration, you would have that same kind of similar outcome, whether you happen to be mildly or moderately impaired or you're a normal patient, right? So what the district court said is that he presumed that the percentages for acetaminophen would be the same for hydrocodone. And in fact, he also relied on the FDA guidance. And under the FDA guidance, the amount of acetaminophen that was over what they expected would have been subject to a potential dose adjustment. So you wouldn't be able to know whether there was a dose adjustment based on those values or not. And in fact, their experts said you couldn't predict whether you needed a dose adjustment or not for the hydrocodone formulation alone. And to the extent that the district court assumed that it would be the same for HI versus non-HI patients because of this data in the vein, that's basically speculation. Because every place you turn, you see entities saying, well, you need to do a hepatic impairment study in order to be able to determine whether a dose adjustment was needed or not. Their experts said that, the FDA said that, our experts said that. Indeed, I think what happened here is that I think that the decision falls into a hindsight trap. Because as I mentioned earlier, there was no information in the vein as to whether or not you needed to adjust the dose. Their expert agreed to that. There's no HI or hepatic impairment information at all. And there's no statement in the vein. It doesn't say you don't need to adjust the dose. None of the references, none of the prior art references say there's no need to adjust the dose for our particular formulations. And so fundamentally, neither the district court nor AllerGen provide a reason to select Jane as... that Jane, that a procedure would understand that Jane taught that there was no need to adjust the dose. You're saying that finding, in fact, was clearly erroneous. Well, it's also, it's inconsistent with its other findings that there was no guidance in the art. It's also inconsistent with its finding that the art is unpredictable. And as a matter of law, in our view, the findings that the art was, that there was no guidance in the art and that the art is unpredictable is inconsistent with the finding that the claims are obvious. We could go to the next layer and say, yes, I also disagree with the particular findings. But I think at a threshold matter, our argument is that... Where does the court say that there was nothing in the art that provided guidance as to how the formulation would work? Is that the part that you quoted a while ago, nothing in the state of the art as of July 2012? Yes, Your Honor. And that was at A-105 in addition and earlier in the opinion. And are you reading the entire quote there? I know that in your brief it wasn't the entire quote. You left an important part out. Your Honor, I wasn't just now reading the entire quote. So, and I wasn't intending to say that I was, if that was understood that way. But I also remember earlier in the opinion, the district court says that there was nothing in the art that would give anyone confidence how to dose hepatically impaired patients. So it's not just what he said in the written description section. It's also in the beginning when he was looking at the prior art as a whole, when he said, well, there's nothing in the art that would give any confidence as what the prior art for hepatically impaired patients would be. So we find, we believe that those statements are entirely inconsistent with one another. I'd like to just touch on written description very briefly. The test for written description is whether the specification allows a person of ordinary skill, whether the test is whether the specification, excuse me, allows a poster to recognize whether the inventors had the claimed invention. There's no dispute here that example eight represents the claimed invention. There's also no dispute that the patent provides additional formulations. It provides dissolution data. It provides PK data. And with regard to those additional formulations and PK data, if one, a person of ordinary skill could use the PK data and dissolution data as target data where they could make formulations. And to the extent the argument is that what... Do you have any sense of how many formulations would fit within these target claims for dosage amounts and PK values? Well, there's a limiting, an important limiting factor that number that would fit within it. And that is that the ratio of the extended release portion to the immediate release portion has to be 80 to 20. And so you have to have that limitation by itself will narrow the universe of potential formulations that could be used. The fact that it's hydrocodone only narrows the universe. The fact that it's an extended release narrows the universe. But do you have any broader sense? No one provided a specific number. I mean, in fact, the testimony from Alvagen's expert was conclusory. Just said a myriad. He didn't put a number. He's not a formulator. So he wasn't really capable of giving that information. Our expert said that, well, based on all the information here, one skilled ER could easily make additional formulations that fit within the no-dose adjustment claim. I just wanted to... But wasn't that the point of the district court's findings? The district court was concerned that your claims were so broad that there was nothing that really explained how you would cover the breadth of those claims. That was the expressed district court issue. But the problem is that the district court didn't consider structural limitations that were provided in the specification and testified by the experts that would limit the breadth of the claims. So the district court said that unclaimed structural features, like the 80 to 20 ratio, doesn't count. And in fact, in the Alcon case, the Alcon v. Barr case, this court ruled that unclaimed characteristics can be used. And likewise, in the Abney case, this court rejected an argument that unclaimed characteristics can't be used. The district court also made a few other legal errors by adding certain types of requirements that are legally impermissible. All of them are addressed in our brief, but I wanted to address two more, aside from the unclaimed characteristics. One... We're way into your rebuttal. Do you want to keep any of it? I'm going to take the next 20 seconds and do these, and then I'll go to two. Okay. One is that the imposed requirement that you understand how the invention worked, that's legally irrelevant. The imposed requirement that you had to test every single formulation, that, too, is legally irrelevant. I'll take the rest. Thank you, Your Honor. Thank you. May it please the Court. I'd like to start where Mr. Condi talked about the court statement, and Judge, your comment about Judge Bryson's comments about nothing in the state of the art. That's got to be looked at in context. In the context there, Judge Bryson was distinguishing the Amgen case, and he was setting forth why this case is distinguishable from the Amgen case, and he was also doing it in the context of the specification here. The specification here talks about the fact that it's Persians' position. It's consistently been their position. That there is some subset of hydrocodone formulations that do require dose adjustment, and some that don't. So, when Judge Bryson was making those statements about the state of the art there, he was talking about the Amgen case, and specifically, he was distinguishing the Amgen case from the case at Barr. But if the state of the art is unpredictable, that cuts dramatically against an obviousness determination, does it not? Correct. It could cut against an obviousness determination, but if you read the entirety of the opinion, the district court clearly wasn't saying that. The district court clearly walked through the art, considered all the art, considered the experts' arguments, their testimony about the arguments, considered Jane, what Jane says. Well, can you make a – can you try to divide and make the distinction between why the court below said the art is unpredictable as to written description, but didn't find the art unpredictable for purposes of motivation to combine? I mean, was he talking about apples and oranges there, or was he just talking about, well, the state of this field is unpredictable, period, and therefore, there's a conflict with the motivation to combine analysis? Yeah. So, specifically, what I believe, and it's always difficult getting to somebody else's mind when they were writing it, I believe he was focused on distinguishing the Amgen case. And in the Amgen case, it was very different, because it talked about whether there was a correlation, and there was no correlation between what was – or there was a correlation. Well, whether it's distinguishing the Amgen case or not, I think Judge Chen's question is still a valid one. Whatever his – the purpose of his analysis was, isn't it still important – I mean, is there something to do with written description that makes the state-of-the-art different than for purposes of obviousness? So, a couple points. Written description and obviousness, obviously, are different standards. And with obviousness, it was incumbent to demonstrate on Albogen, which we did in the district court, found that a single formulation would have been expected and predictable to produce the claimed pharmacokinetics or the non-adjustment, which flows from the claimed pharmacokinetics. You're talking about the specific prior art formulation described in DeVane. Correct. And for written description, the standard's broader. It's not the case that if you have a reasonable expectation of success, that you will necessarily demonstrate that you have possessed the invention. And in fact, the Ariad case exactly direct – excuse me, directly addressed that and said that a description that merely renders the invention obvious does not satisfy the written description requirement. So you have to look at it in the two different lenses. The other lens you need to look at is the specification here, according to the district court, and we fully support this, misconstrued with the prior art set. So when the district court is evaluating the specification, the district court is looking at what the patent holder is contending the state-of-the-art says. The specification states that there was some, you know, unknown ability of hydrocodone of their specific claim, or what they intended to claim, hydrocodone formulation that would produce the non-adjustment or the PK characteristics. When Judge Bryson is addressing the obviousness, he's not limited by what the specification states. In fact, there's a Boston Scientific decision by this court, 647 F3D 1353, in which the court specifically addressed a situation where the specification was contrary to the prior art. And when that's the case, the patent holder can't rely on the prior art to fill in the gaps that they didn't have in their specification. I wanted to address a couple other points that were raised. Certainly, it was clear in Pershing's presentation that the heart of this case are a number of factual determinations made by the court. And in fact, counsel started by saying that those factual, that this case should be reversed because of those factual determinations. The problem with that is there is a very high bar when there are factual determinations underlying a district court case. And this court can only overturn them if they're clearly erroneous. Certainly, Pershing has not demonstrated that those factual findings are clearly erroneous. Can you address the inherency discussion? Because we have said repeatedly that we're skeptical of use of inherency in an obviousness inquiry, and we will look at it very carefully to make sure that it is fair to apply it in those circumstances, as opposed to anticipation where it's more appropriate. Yes, absolutely, Your Honor. And you think that the court's inherency analysis satisfies those requirements? Yes. So this court made clear in the Par VTWI case that inherency can be used in obviousness cases, and that case dealt with the use of a drug to treat a condition. Right, but in Par Pharma and others, we made clear that use of inherency in those types of cases is very limited. Yes. And here, the district court made multiple findings to show that the claim of pharmacokinetics or non-adjustment is inherent in the Dane formulation. As you know here, all the patent holders did here was take a prior art formulation from the Dane, the HCER formulation, run a test required by FDA, a hepatic impairment test, and then claim this broad functional genus result. There's no real dispute that it's the Dane formulation that leads to the claim pharmacokinetics. So really, there was no dispute below. There is no dispute here that the Dane formulation inherently has these claim properties. So this fits squarely within the court's discussion of when you should use inherency in obviousness cases, because it is certainly the natural result of administering the Dane that you will lead to these claim pharmacokinetic parameters. What about the predictability of administering the Dane's formulation to hepatically impaired patients with an expectation that you wouldn't need to adjust the dosage when the prior art suggested to the contrary? So there are two issues in there. The administration, just two HI patients, I think is undisputed that there was an expectation that you could do that. Certainly no one rebutted that you could administer. But then about your point of the no-dose adjustment. While the specification would like you to believe, and while Pershing would like you to believe that the prior art taught away from that, the district court made multiple findings based on the art and based on expert testimony that that simply wasn't the case. And Jane, which is the primary reference the court relied on to that, is directly applicable to that point. So Jane performed a hepatic impairment study with a hydrocodone formulation, had hydrocodone and acetaminophen, as you talked about earlier. And Jane found that there were similar pharmacokinetics in HI patients and non-HI patients. Now counsel would like you to believe that the court then just made presumptions after the court looked at Jane. That's simply not the case. There were multiple experts, Dr. Schmidt and Dr. Weinberger, who talked about how a person of ordinary skill in the art would interpret and read Jane. And those experts both said that a person of ordinary skill in the art would understand that when Jane is saying in a similar pharmacokinetics, Jane is saying you don't have to adjust the dose. And that's frankly the real purpose of even doing a study, a hepatic impairment study, is to find out, do you need to adjust a dose? So when Jane used the shorthand of saying it was similar, that told everyone of skill in the art that you didn't need to make a dose adjustment. What's your response to your friend's argument that the court erred in looking to the FDA's directors? So it's very interesting, Your Honor. So what Pershing doesn't say is that it was legally improper for the district court to take judicial notice of the FDA guidance. And there's a very good reason for that. The law doesn't support that. The federal rules of evidence are very clear that a court is allowed to take judicial notice of a document like that. And that's what the court did. So the court took judicial notice of the FDA communication. But one thing to keep in mind on that is that was one of four separate reasons why the district court found motivation. And it wasn't even the most important. So the court made four separate findings of why a person of ordinary skill in the art would be motivated to combine. The first was that acetaminophen was known to be toxic, that hydrocodone was not. The second was that FDA relied on, when Pershing or a predecessor company submitted an NDA to FDA, relied on a combination product, a hydrocodone-ibuprofen product, in terms of evaluating whether the ZOHydro product would be approved. The third was the FDA guidance. But the fourth, and the court deemed the most significant finding, the court said most significantly a person of skill in the art would have appreciated that acetaminophen and hydrocodone are metabolized differently. So the court made four separate findings, and the most significant was not based on the FDA guidance. Your Honor, just quickly, I'd like to address some of the written description points, some of the written description points that were brought up. First on the test itself, counsel mentioned a very broad test. We have a very specific test when you have functional claims that are a genus, directed to a genus, and two things, one of two things have to be met. Either a representative number of species need to be disclosed, or structural features that are common to the members of the genus need to be disclosed that would allow a person of ordinary skill in the art to determine and visualize all the members of the genus. The district court used that proper test and found out that neither were met here. Your Honor asked about how many different formulations could potentially fall under the claims here, and I think that's a key finding, and again, this is a key factual finding that could only be reversed for clear error. The court, there was testimony that a myriad number of formulations could fall under the claims. There was testimony by both Persians and albogens experts that this could include liquids like suspensions, syrups, solutions, or emulsions. It could include solids like tablets, capitals, lozenges, matrix, pulsatile, osmotic formulations. And the district court heard all this testimony and came to the conclusion that there was a limitless number of formulations that potentially fall within the functional genus that's in the claims. Council mentioned some 2080 requirement. That functional limitation is not in the claims. The claims don't have that in the claims, so that's really irrelevant for the written description. And maybe most importantly, the specification nowhere, and Persians expert admitted this at trial, the specification nowhere discloses a special sauce. So nowhere says that there are these special things you need to put into your formulation, and if you do, you don't have to adjust. If you don't, you're going to have to adjust. So, Your Honors, if you don't have any further questions, thank you for your time. Thank you. Okay. 210 for Rebecca. Thank you. Let me just address the last issue first about special sauce. That just goes back to the fact that the vendors did not understand how the invention actually works, and so the special sauce is essentially irrelevant. Turning back to obviousness. I'm sorry, could you say that again? Sure. The vendors didn't understand how the invention worked? The inventors didn't know why. I should have used the word why the invention worked. They didn't know why there was not a need for dose adjustments. They just knew that these formulations, that you didn't need a dose adjustment. The particulars as to why the invention didn't need a dose adjustment was not known to the inventors. The inventors don't need to know why the invention works or does not work. Well, they knew that the Devane formulation could have these certain properties, desirable properties, and then they claimed any and every formulation that has those desired properties, right? Yes. They knew that the Devane formulation worked, but they didn't even understand what made the Devane formulation allow you to dose the drug without adjusting the dose for hepatic liver patients. So, taking that as true, then how could one say that they communicated to one of Skill in the Art that they had possession of every single other formulation that's unknown right now that could have these desirable properties? I don't think anyone needs to know why the invention works, what causes the invention to work. One Skill in the Art would look at the other information in the patent, including dissolution data, which could be used as a target to make other formulations that would fit within the formulation. You would just run a PK study, which all the experts agreed was a standard study in this area. Just to address inherency, Judge O'Malley, you raised that issue. The issue here is that the Devane doesn't naturally flow to adjusting the dose for hepatically impaired patients because it's silent on the issue. And whether you could do that or not is not the point, because under inherency, the fact that you could do something doesn't make it inherent. And I'm running out of time. But it's the PK profiles that he was finding to be inherent, right, the ones in Devane? Right. But there was no guarantee that a person Skill in the Art taking Devane would have avoided adjusting the dose. They more likely would have taken Devane and adjusted the dose and come up with different... He didn't rely on that for purposes of his findings. He just relied on it for purposes of saying the PK profiles. And they're exactly the same as in the patent, right? Well, there's no PK profiles in Devane for HI subjects. There are PK profiles in the patent for the HI subjects, and that's the difference. What dose would you have given an HI subject, a hepatically impaired subject, given the state of the art, and if all you had was Devane, and one Skill in the Art could have adjusted the dose. Just like Dr. Schmidt said, it's a hypothesis whether you could adjust the dose or not. You needed to run testing to figure that out. I see I've gone over my time now. Okay, thank you. All right, the cases will be submitted. This court is adjourned. All rise. The Ottawa court is adjourned until tomorrow morning.